**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Peg Ball; Cree James, a minor person by and through her grandfather and guardian Bennie James; Jeanne Spinka; Vennetta Graham; Collin Phelan, a minor person by and through his mother Kim Bowman; Judeth Hinton; and Virginia Haskell, as individuals and as representatives of a class of person similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Anthony D. Rodgers, Director of the Arizona Health Care Cost Containment System; The Arizona Health Care Cost Containment System Administration; and the State of Arizona,<br><br>Defendants. | No. CV 00-67-TUC-EHC<br><br>**ORDER** |

Pursuant to the Ninth Circuit's instructions on remand, the Court has determined that Defendants waived any defense that they are not subject to the Medicaid Act's free choice provisions and they violated the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA). (Dkt. 394.) The Court has modified the injunction, striking any reference to the Medicaid Act's equal access provisions and including violations of the ADA and RA. (Id.) The Court has also ordered that the injunction is permanent and will continue for whatever period is necessary for enforcement purposes. (Dkt. 414.) The Court has withheld judgment on whether to further modify the injunction because it is unclear whether

Defendants have complied with the injunction and whether circumstances have changed. (See Dkts. 394 at 9-10; 420 at 2; & 427 at 3.) Therefore, the only issue remaining before this Court is whether to further modify the injunction.[1]

The Court may modify or dissolve an injunction if "applying it prospectively is no longer equitable." Fed.R.Civ.P. 60(b)(5). A party seeking modification of an injunction bears the burden of establishing that a significant change in circumstances warrants revision of the injunction. See Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 383 (1992) (discussing requirements for modification of a consent decree). A party seeking modification of an injunction may meet its initial burden by showing a significant change either in factual conditions or in law. Id. at 384; see also Sharp v. Weston, 233 F.3d 1166, 1170 (9th Cir. 2000) ("A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction."). "If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." Rufo, 502 U.S. at 383.

Plaintiffs' Motion to Modify the Injunction (Dkt. 403) and Defendants' Cross-Motion to Vacate or Modify Injunction (Dkt. 422) are pending before the Court. According to the Court's August 14, 2009 Order (Dkt. 434), the parties submitted evidence in support of their motions (Dkts. 439 - 442) and objections to the opposing parties' evidence (Dkts. 443-444). Plaintiffs' Second Motion to Appoint Special Master (Dkt. 438) and Defendants' Motion to Strike Plaintiffs' Expert Report (Dkt. 445) are also pending before the Court. These motions have been fully briefed. The Court will address each of these motions below.

/ / /

---

[1] Defendants filed an appeal to the Ninth Circuit on May 13, 2009. (Dkt. 399.) The Court may modify an injunction while an appeal is pending. See Fed.R.App.P. 8(a)(1)(C) ("A party must ordinarily move first in the district court for... an order suspending, modifying, restoring, or granting an injunction while an appeal is pending.").

## I. Plaintiffs' Motion to Modify the Injunction

Plaintiffs contend that Defendants have failed to (1) create a system that fills gaps in two hours, (2) require Home and Community Based Services ("HCBS") contractors to have back-up caregivers, and (3) implement a hotline and expedited grievance system. (Dkt. 404 at 2-4.) Plaintiffs request that the Court modify the injunction and order Defendants to:

> A. Immediately remove its "Member Service Preference Level" system from all policies, contracts, forms etc.
> B. Revise all relevant contracts, policies etc. to include:
>     I. A provision specifically requiring the program contractors to have back-up workers; and
>     ii. A provision requiring program contractors to inform members, verbally and in writing, of the existence of and their right to a back-up worker at every 90 day review and at any meeting where the critical services are discussed and/or authorized.
> C. Comply with the Court's orders regarding the hotline and grievance system.[2]

(Dkt. 403-1 at 2.)

Defendants argue that they have met the requirements that gaps be prevented and filled, and there is no need to rewrite contracts because back-up staffing exists. (Dkt. 407 at 4 & 6.) Defendants also argue that the hotline requirement is met because all the Program Contractors have after hour phone numbers that HCBS members can call. (Id. at 8.)

There are three primary issues of contention. First, whether Defendants have required HCBS Program Contractors to have back-up caregivers to substitute for any unforeseeable gaps. Second, whether Defendants have implemented a hotline. Third, whether Defendants have created a system that fills gaps in critical service within two hours.

---

[2] Plaintiffs' Second Memorandum in Support of Motion to Modify Injunction requests two additional modifications to the injunction. (See Dkt. 440 at 13.) Specifically, Plaintiffs' request that the Court "[r]equire back-up/contingency plan forms to be uniform and to note the member's right to agency back-up services within two hours," and order Defendants to "[c]omply with the Court's orders regarding real-time and retrospective gap reporting by utilizing methods outlined in Dr. Seavey's report, particularly by using gap monitoring methods other than self-reporting by members." (Id.) The Court will not consider these additional modifications because they were proposed without explanation in a supplemental memorandum. See Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007) (the "district court need not consider arguments raised for the first time in a reply brief").

1 | **A.  Back-up Caregivers**

The Court ordered the Arizona Health Care Cost Containment System ("AHCCCS") to require HCBS Program Contractors to "have back-up staffing available on-call to substitute for those times when an unforeseeable gap occurs." (Dkt. 248, ¶1(D).) To determine whether Defendants have complied with this requirement, the Court ordered Defendants to submit "copies of the provisions in the contracts of HCBS Program Contractors that require back-up workers." (Dkt. 434 at 4.)

Defendants submitted the relevant provision of AHCCCS's Program Contractor Agreement, which states:[3]

> **Ball v. Biedess (Rodgers):** In order to fulfill the settlement [sic[4]] in the Ball v. Biedess (Rodgers) case the Program Contractor is responsible for establishing a network of contracted providers adequate to ensure that critical services are provided without gaps. The Program Contractors shall resolve gaps in critical services within two hours of a gap being reported.
>
> The term "critical services" is inclusive of tasks such as bathing, toileting, dressing, feeding, transferring to or from bed or wheelchair, and assistance with similar daily activities. A "gap in critical services" is defined as the difference between the number of hours of home care worker critical service scheduled in each member's HCBS care plan and the hours of the scheduled type of critical service that are actually delivered to the member. Also see AMPM Chapter 1600, Policy 1620, Standards IV(I) for an explanation of "critical services".
>
> The Program Contractor shall implement policies and procedures to identify, correct, and track gaps in service[.] See ACOM Gap-In-Services Policy. These policies shall, at a minimum, cover the following areas:
>
> • Information to members on their right to receive services authorized.
> • Information to members on how to contact Program Contractor or its Subcontractor when one of the above stated services is not provided as scheduled.
> • At the time of the initial quarterly reassessment case managers are required to assess a member's needs, including a member's service preference level if a gap in services were to occur and develop a contingency plan in the event of a gap in a member's services.

---

[3] Plaintiffs also submitted copies of the AHCCCS "Contract Amendment," which includes the same provision submitted by Defendants. (See Dkt. 442, Exh. 2 & 3.)

[4] This provision is misleading because the parties have not reached a settlement in this case. To the extent that Defendants reference this case in any contracts, Defendants should refer to the "injunction," "order," or "decision" in Ball v. Rodgers, not a "settlement."

- 4 -

> • The Program Contractor's process for providing services in the event of a gap in service. This shall include guidelines on how timely the Program Contractor or its Subcontractors shall be in providing services in the event of a gap in service.
> • Tracking and trending gaps in services and grievances as a result of gaps.
>
> On a semi-annual basis, (November 15, May 15), the Program Contractor shall submit a report to AHCCCS outlining trends and corrective actions regarding gaps in services, grievances related to service gaps, and other reports as deemed necessary to fulfill the settlement agreement in the Ball v. Biedess (Rodgers) case. See also D, ¶16 Case Management.

(Dkt. 441 at 3 & Exh. C.)

Plaintiffs contend that "Defendants do not explicitly require [Program Contractors] to have back-up workers," and Program Contractors "lack" back-up workers. (Dkt. 404 at 3.) Defendants argue that "the AHCCCS contract language clearly complies with the Court's Order" because the Agreement makes Program Contractors "responsible for providing services without gaps and for resolving any gaps that occur." (Dkt. 441 at 3.) Defendants also argue that Program Contractors have back-up caregivers, and there is no need to rewrite contracts. (Dkt. 407 at 6.)

Although Program Contractors are responsible for ensuring that there are no gaps in critical services and some Program Contractors may have back-up caregivers available, the Program Contractor Agreement does not explicitly require Program Contractors to have back-up caregivers available, on-call to substitute for an unforeseeable gap. (See Dkt. 248, ¶1(D).) The Program Contractor Agreement merely states that the Program Contractor is "responsible for establishing a network of contracted providers adequate to ensure that critical services are provided without gaps," and shall "develop a contingency plan in the event of a gap in a member's services." (See Dkt. 441, Exh. C & Dkt. 442, Exh. 2 & 3.)

The Court does not have sufficient information to determine whether all HCBS Program Contractors have back-up caregivers available. Plaintiffs submitted declarations from class members or their representatives, stating, among other things, that caregivers are unreliable, family members fill pressured to sign on as back-up caregivers, back-up caregivers are rarely available or unqualified, and back-up caregivers have not been sent

1  when gaps are reported.[5] (Dkt. 442, Exh. 10-15.) Defendants also submitted declarations
2  from HCBS members or their representatives and HCBS Program Contractor Directors,
3  stating that back-up caregivers are available and HCBS members are aware that they are
4  available. (See e.g. Dkt. 441, Exh. F (declaration of the CEO of SOREO In Home Support
5  Services LLC, stating that it has a team of "floaters" to provide gap coverage) and Exh. G
6  (multiple declarations from HCBS members stating that they understand that back-up
7  caregivers are available, although they prefer family or friends as back-up caregivers).)

8  The Court does not have any records indicating whether every Program Contractor
9  has back-up caregivers available. The declarations and affidavits submitted by Plaintiffs and
10 Defendants only refer to some of the Program Contractors. Although some Program
11 Contractors may have back-up caregivers available, it is clear that the Program Contractor
12 Agreement does not explicitly require them to do so.

13 The parties also dispute whether HCBS members prefer to have family or friends
14 rather than back-up caregivers resolve gaps in critical services. (See Dkt. 407 at 5.) This
15 dispute is irrelevant to whether Program Contractors have back-up caregivers available, on-
16 call to substitute for those times when an unforeseeable gap occurs. Although some members
17 may prefer to have family or friends resolve gaps in service, this preference does not relieve
18 Program Contractors of their responsibility to ensure that back-up caregivers are available
19 in case there is an unforseen need, such as the unavailability of family or friends, who have
20 volunteered to provide back-up services. (See Dkt. 248 ¶1(D) (requiring back-up staff for
21 unforeseeable gaps in service).)

22 The Court finds that Defendants do not require HCBS Program Contracts to have
23 back-up caregivers available. Defendants shall modify all relevant contracts, policies, and
24 forms, including the Program Contractor Agreement, to explicitly require Program

---

[5]Defendants submitted a Declaration from Alan Shafer, the ALTCS Manager at AHCCCS, Division of Health Management, stating that the problems reported in the November 2008 declarations were either incorrect, not reported to AHCCCS, or have been remedied. (Dkt. 445, Exh. 1.)

1  Contractors to have back-up caregivers available, on-call to substitute for those times when
2  an unforeseeable gap occurs.

**B.     Hotline**

The Court ordered AHCCCS to "implement an expedited grievance process by August 15, 2005 whereby each qualified individual: 1) may call **a hotline** and speak with a live operator to report any gap in critical services; 2) is provided with a standardized form to complete and mail to report this gap; and 3) receives a response, via telephone or the mails, acknowledging the gap and providing a detailed explanation as to the reason for the gap and the alternative plan being created to rectify that gap and any possible future gaps." (Dkt. 248, ¶ 6 (emphasis added).)

Plaintiffs allege that the hotline does not exist. (Dkt. 404 at 4.) Defendants claim that "Program Contractors provide members with telephone number(s) for the provider and/or Program Contractor that work 24 hours per day, 7 days per week. If a live operator is not available to answer a call immediately, the member may leave a voice mail or digital message so that a person able to respond effectively and immediately returns the message." (Dkt. 407 at 8-9.) Defendants also claim that Plaintiffs "have yet to offer a basis for their 'concerns' about the telephone system or how it 'casts doubt' on the gap reports." (Id. at 9.)

The Court ordered Defendants to submit "the hotline telephone number that the Court ordered Defendants to implement." (Dkt. 434 at 4.) Instead of submitting a hotline telephone number, Defendants submitted a list of eighteen different "Program Contractor 24/7 Phone Numbers." (Dkt. 441, Exh. A.) Defendants contend that "[t]hese are the telephone numbers that fulfill the requirement to provide members with an effective number to call (24 hours a day, 7 days a week) when a gap occurs." (Dkt. 445 at 9.)

The Court ordered AHCCCS to implement a grievance process whereby each member may call "**a** hotline" to report gaps in critical services, not a "telephone system" of multiple phone numbers that members may call to contact a Program Contractor. (See Dkt. 248, ¶ 6 (emphasis added) and Dkt. 407 at 9.) Although Defendants have provided members with "24/7 Phone Numbers" that may be called to report gaps in service, this does not comply

with the Court's order to establish a hotline. The Court's order was that AHCCCS would establish a single toll-free phone number that all HCBS members could call to report any gap in critical service, not a system of phone numbers that may be used to contact a Program Contractor.

The Court finds that Defendants have not established a hotline, according to the plain language of the Court's June 28, 2005 Order (Dkt. 248). Defendants shall establish a single toll-free hotline telephone number that individuals may call to speak with a live operator to report any gap in critical services.

Defendants contend that a "single-number system would simply result in whoever received the member's call having to call the person's Program Contractor or provider, using the very numbers to reach the very people that the member now calls first," and add "another layer of time, expense, and effort" that would not benefit anyone and increase the risk of miscommunication. (Dkt. 445 at 9-10 (emphasis in original) & Exh. 1.) Because the injunction expressly requires Defendants to establish a hotline, Defendants have the burden of showing that a hotline is unnecessary. See Rufo, 502 U.S. at 383 (the party seeking modification bears the burden of establishing that a significant change in circumstances warrants revision). Defendants have not shown that a hotline is unnecessary or explained why they failed to create a hotline, as previously ordered. Defendants do not contend that a hotline would create an undue burden or financial hardship.

Defendants cannot disobey the plain language of the injunction because they think another method may be better. Defendants must request a modification of the injunction and show that a significant change in circumstances warrants revision of the injunction.[6]

### C.  Gaps in Critical Services

The Court ordered that the AHCCCS, HCBS program must "provide each individual who qualifies for critical services ("qualified individual") with those critical services for

---

[6]Although Defendants' filed a Motion to Vacate or Modify the Injunction, Defendants did not specifically request a modification to the hotline requirement. (See Dkt. 422.)

- 8 -

which the individual qualifies without gaps in critical service." (Dkt. 248, ¶ 1; see also Dkt. 212 at 12.) The Court defined critical services as "personal care services such as bathing, toileting, dressing, feeding, transferring to or from beds or wheelchairs, and assistance with other similar daily activities." (Dkt. 248, ¶1(A).) The Court defined a gap in critical services as "the difference between the number of hours of home care worker critical service scheduled in each qualified individual's HCBS care plan and the hours of the scheduled type of critical service that are actually delivered to the qualified individual." (Dkt. 248, ¶1(B).) The Court ordered that "[u]nforeseeable gaps are to be corrected as quickly as possible, at least within two hours."  (Dkt. 248, ¶1(D).)

The Court further ordered that "the AHCCCS program must develop adequate alternative or contingency plans for instances when a critical service is unable to be provided." (Dkt. 248, ¶ 2; see also Dkt. 212 at 12.)  The Court ordered AHCCCS to monitor its entire program so that any critical services that are not being provided can be detected in enough time to implement the alternative or contingency plan and eliminate the gap in less than two hours.  (Dkt. 248.)

Plaintiffs contend that Defendants have failed to create a system that fills gaps in two hours.  In particular, Plaintiffs contend that Defendants' monthly gap reports are unreliable and the "Member Service Preference Level" system violates the injunction.

### 1. Monthly Gap Reports

The Court ordered AHCCCS to "monitor its entire program so that any critical services that are not being provided can be detected in enough time to implement the alternative or contingency plan and eliminate the gap in less than two hours." (Dkt. 248 at 3, ¶ 5.)  The Court further ordered AHCCCS to file annual reports, "concerning their methods for monitoring gaps in critical services throughout the state," and monthly gap reports on the first of each month.  (Id. at 3-4.)

On June 2, 2009, the Court ordered Defendants to "continue to file monthly gap reports and annual reports until the Court determines that these reports are no longer necessary."  (Dkt. 414 at 4.)  The Court further ordered Plaintiffs to file objections, if any,

to Defendants' monthly gap reports and annual reports within ten days after Defendants file the reports. (Id.)

Defendants have filed monthly gap reports almost every month since September 1, 2005. (See Dkts. 255 & 460.) Beginning July 8, 2009, Plaintiffs have filed Objections to Defendants' gap reports. (See Dkts. 421 & 461.) Defendants have filed Responses to Plaintiffs' Objections. (See Dkts. 423 & 463.)

Plaintiffs argue that the gap reports "are not a reliable indicator of the extent of gaps in the system." (Dkt. 454 at 2.) Plaintiffs also report that there are still hundreds of gaps in critical services and most of these gaps are filled by unpaid caregivers because no agency staff are available. (See Dkt. 449 at 2-7.) Plaintiffs reiterate these arguments in each of their objections. (See e.g. Dkt. 458 at 2-4.)

Defendants argue that they successfully provide over 99% of services without gaps, and because there are circumstances beyond the control of Defendants, it is not possible to provide services without any gaps. (See e.g. Dkt. 458 & 461.)

The Court has reviewed Defendants' gap reports and the evidence submitted by the parties. According to Defendants' monthly gap reports, there are still gaps in critical services. For example, in January 2010, Defendants reported 569 hours of gaps in critical services out of 1,830,357 hours of authorized services, equaling 0.03% of the total hours provided. (Dkt. 464.) The cause of the continued gaps in critical service is unclear. It is also unclear what modifications, if any, should be made to the gap reports.

The Court cannot make a determination, regarding the cause of the continued gaps in critical services or the reliability of the gap reports, based upon the parties' allegations. As noted above, a party seeking modification of an injunction bears the burden of establishing that a significant change in facts warrants revision of the injunction. Sharp, 233 F.3d at 1170. At this time, there is insufficient evidence of the cause of the gaps in service and the reliability of the gap reports for the Court to further modify the injunction.

The gaps in services may be reduced if Defendants establish a hotline and require Program Contractors to have back-up caregivers available, as ordered by the Court.

Defendants' failure to establish a hotline and require back-up caregivers may explain some of the continued gaps in critical services; however, it does not establish a significant change in circumstances warranting further revisions of the injunction.

### 2. Member Service Preference Level

The Member Service Preference Level ("MSPL") indicates "how quickly the [HCBS] member chooses to have a service gap filled if the scheduled caregiver of that critical service is not available." AHCCCS Medical Policy Manual, Chapter 1600, Policy 1620, 1620-17 (found at Dkt. 442-4 at 4 and Dkt. 441-2 at 3). The MSPL is "based on the most critical in-home service that is authorized for the member." Id. The MSPL allows the HCBS member to choose whether to have gaps in authorized services filled "within 2 hours," "today," "within 48 hours," or whether the service "can wait until next scheduled day." Id.

The MSPL allows HCBS members to choose when care will be delivered and allows Program Contractors to prioritize the need for resolving gaps in services. The AHCCCS Medical Policy Manual and AHCCCS Contractor Operations Manual discuss the procedure for determining an HCBS member's MSPL. The MSPL is determined during the Case Manager's initial visit and reassessed, at least quarterly, at each review visit, and again when a gap in service is reported, depending upon the immediate circumstances. Id. at 1620-18; see also AHCCCS Contractor Operations Manual, Chapter 4, Attachment B, Gap In Service Log Instructions, ¶ 11 & 12 (found at Dkt. 442-5 at 11). "The plan to resolve the service gap must address the member's choice a the time the gap is reported." Id.

Plaintiffs claim that the MSPL "is coercive in nature and shifts the burden that is rightfully Defendants to the [HCBS] member and his or her family." (Dkt. 416 at 3.) There is no evidence, however, that the MSPL is coercive or has been used to circumvent the injunction. The Court cannot modify the injunction based upon speculation and conjecture. According to the AHCCCS Medical Policy Manual, HCBS members are informed of their right to receive gaps in critical services filled within two hours, and "the member or representative has the final say in how (informal versus paid caregiver) and when care to replace a scheduled caregiver who is unavailable will be delivered." (Dkt. 442-4 at 3.)

There is also no evidence that HCBS members have not been notified of their right to have gaps in service filled within two hours, or that the MSPL has confused or mislead HCBS members, regarding their right to have gaps in service filled at least within two hours.

The AHCCCS Medical Policy Manual explicitly requires Program Contractors to "ensure that critical services are provided within two hours of the report of the gap" and provide "HCBS in-home members or member representatives [with] the Important Member Rights Notice Form [], informing them of their rights pursuant to the Ball v. Biedess order." (Dkt. 442-4 at 2-3). The "Important Member Rights Notice" form states:

> You have the right to receive all the services in your care plan to help you with bathing, toileting, dressing, feeding, transferring to or from your bed and wheelchair and other daily activities. These services are called "critical services." Your program contractor or tribal contractor must make sure that you receive these critical services without delays. If there is a delay and you do not receive these services on time, your program contractor or tribal contractor must provide them within 2 hours of the time they are notified of the gap. (A gap in critical services is defined as the difference between the number of hours of critical service scheduled in each individual's care plan and the hours of the scheduled type of critical service that are actually delivered to the individual.) Your other long term care services cannot be reduced to make up for the critical services that you did not receive on time.

(Dkt. 254-13 at 4-5.) This notice is consistent with the Court's prior orders and should help ensure that HCBS members and their representatives are notified of their rights and that the MSPL is not used to circumvent the injunction.[7]

At this time, the Court cannot find that the MSPL violates the Court's injunction and should be removed from all policies, contracts, and forms.

### D. Conclusion

Plaintiffs' Motion to Modify the Injunction will be granted in part and denied in part, according to this Order. Defendants shall establish a hotline, as previously ordered. Defendants shall also modify all relevant contracts, policies, and forms, including the Program Contractor Agreement, to explicitly require Program Contractors to have back-up caregivers available, on-call to substitute for those times when an unforeseeable gap occurs.

---

[7] As ordered below, this Notice should also inform HCBS members that they have the right to have a back-up worker substitute when an unforeseen gap in critical service occurs.

- 12 -

The Court recognizes that there are still gaps in critical services and there are unforeseen circumstances that will cause gaps in service. The substance of the Court's injunction should be sufficient to protect Plaintiffs and limit the gaps in critical services. Without any evidence of any significant changes in circumstances, the Court cannot make any further modifications to the injunction.

**II.    Defendants' Cross-Motion to Vacate or Modify Injunction**

Defendants argue that "it is no longer equitable to hold the defendants to a legal standard (42 U.S.C. §[] 1396n) that does not apply." (Dkt. 422 at 2-4.) On April 24, 2009, the Court held that "Defendants waived any defense that § 1396n does not apply to Arizona." (Dkt. 394 at 10.) Defendants appealed the Court's decision to the Ninth Circuit. (Dkt. 399.) Defendants' arguments go to the merits of the Court's April 24, 2009 Order and are more appropriate for Defendants' appeal. See Defenders of Wildlife v. Browner, 909 F. Supp. 1342, 1351 (D. Ariz. 1995) (a party should not ask a court "to rethink what the court had already thought through—rightly or wrongly") (internal citation omitted).

Defendants also argue that they "have complied with the injunction," and "the circumstances that existed at the time of trial no longer warrant an injunction on plaintiffs' remaining legal theories." (Dkt. 422 at 2 & Dkt. 407.) Defendants argue that there "there is no present basis under the plaintiffs' remaining legal theories to maintain the injunction." (Dkt. 422 at 7.)

The Court has reviewed the submissions of the parties and finds no reason to vacate the permanent injunction. Although Defendants submitted some evidence that circumstances have improved and individuals are receiving critical services with fewer gaps, Defendants have not submitted sufficient evidence for this Court to conclude that there has been a significant change, warranting dissolution of the injunction. See Sharp, 233 F.3d at 1170 (noting that a party seeking dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants dissolution of the injunction). As discussed above, the Court has found that Defendants have not fully complied with the Court's

injunction because they do not require HCBS Program Contractors to have back-up caregivers available and have not established a hotline to report gaps in critical services. Thus, the permanent injunction remains in full force and effect pending Defendants' appeal to the Ninth Circuit.

Defendants argue, in the alternative, that the injunction "should be modified to delete any provision that does not have some direct, demonstrable relationship to the present legal theories of the plaintiffs, rather than the 'equal access' theory upon which the Court's 2004 decision largely rested." (Dkt. 422 at 9.) Defendants also argue that "Plaintiffs should be required to demonstrate that any of their criticisms of Defendants constitute a violation of the ADA and [RA]..." (Id.) The Court has already found that Defendants violated the ADA and RA and modified the injunction to strike any reference to the Medicaid Act's equal access provision. (See Dkt. 394 at 7-10.) Defendants do not identify any provisions of the injunction that do not have a "direct, demonstrable relationship" to the Medicaid Act's free choice provisions, the ADA, or RA. Thus, Defendants' arguments are without merit.

Defendants' Cross-Motion to Vacate or Modify Injunction will be denied.

## III. Plaintiffs' Renewed Motion to Appoint a Special Master

Plaintiffs Motion to Extend and Modify Injunction also requested the Court to appoint a master to evaluate Defendants' compliance with the Court's Orders. (Dkts. 403 & 404.) At the June 1, 2009 Status Conference, the Court denied Plaintiffs' request to appoint a master. (See Dkt. 413.) At the July 22, 2009 Hearing, Plaintiffs renewed their request for an appointment of a master. (See Dkt. 434 at 3-4.) On August 24, 2009, the Court noted that Plaintiffs should file a properly supported written motion for an appointment of a master and proposed order for the Court's consideration. (Id.)

On September 14, 2009, Plaintiffs filed a "Renewed Motion to Appoint a Special Master," a proposed order, and a supporting memorandum. (Dkts. 438-439.) Plaintiffs

assert that "Defendants' full compliance with the orders of the Court is brought into question by the record and by the previous declarations of class members."[8] (Dkt. 439 at 3.)

Defendants object to the appointment of a special master. (Dkt. 444.) Defendants argue that an appointment of a master, at Defendants' expense, would "only cause unnecessary delay and expense." (Id. at 1-2.) Defendants also argue that the issue of compliance with the injunction is not complex and may be resolved by the evidence submitted by the parties or, if necessary, by holding an evidentiary hearing. (Id. at 3-4.)

The Court has discretion whether to appoint a special master. Burlington Northern R. Co. v. Dept. of Revenue of State of Wash., 934 F.2d 1064, 1071-72 (9th Cir. 1991). "The use of masters, however, is restricted to situations where they are necessary to aid judges in the performance of specific duties, as they may arise in the progress of a cause." Id. (internal citations omitted). The Court "should appoint a special master only in exceptional circumstances." Hook v. State of Ariz., 120 F.3d 921, 926 (9th Cir. 1997) (citing Burlington Northern R. Co., 934 F.2d at 1071). According to Federal Rule of Civil Procedure 53(a), a court may appoint a master only to "perform duties consented by the parties," hold trial proceedings and make recommendations if there is an "exceptional condition" or "need to perform an accounting or resolve a difficult computation of damages," or "address... posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed.R.Civ.P. 53(a)(1).

At this time, Plaintiffs have not shown that a special master is necessary. Plaintiffs have not shown that there are any complex matters, exceptional conditions, or post-trial matters that cannot be effectively and timely addressed by this Court. Plaintiffs also do not

---

[8]Plaintiffs' Motion does not cite the documents in the record that allegedly question Defendants' compliance and does not attach or cite to any declarations of class members. (See Dkt. 439.) The Court found six declarations dated November 2, 2005 through February 15, 2006 (Dkt. 271-1 & 272-1), three declarations dated August 14-16, 2006 (Dkt. 293-1 & 294-1), and six declarations dated November 13-16, 2008 (Dkt. 374-1 & 442-10-15). The Court has not found any other documents in the record that may support Plaintiffs' contention.

cite to any relevant authority in support of their request for an appointment of a special master.[9] Therefore, Plaintiffs' Renewed Motion to Appoint a Special Master will be denied without prejudice to re-urging as appropriate.

## IV. Defendants' Motion to Strike Plaintiffs' Expert Report

Plaintiffs submitted the expert report of Dorie Seavey, Ph.D., in support of their Motion to Modify the Injunction. (Dkt. 442, Exh. 1.) Dr. Seavey testified at the bench trial in this case in October 2003. (See Dkt. 212 at 6, ¶¶ 47-49.) Plaintiffs asked Dr. Seavey to "analyze the adequacy of the steps that AHCCCS has taken to address the problem of gaps in critical services for ALTCS members living in home-based settings." (Dkt. 442-1 at 2.) Dr. Seavey completed her report on September 14, 2009. (Dkt. 442-1 at 20.)

Defendants argue that Dr. Seavey's September 14, 2009 Report should be stricken because it "is hearsay and lacks foundation as an opinion regarding whether the Defendants are [] complying [with the injunction]." (Dkt. 445 at 2.) Plaintiffs argue that Defendants present no basis to strike the report from evidence because Dr. Seavey is a qualified expert, Dr. Seavey's report is not hearsay, is reliable, and will help the Court understand the evidence. (Dkt. 450.)

"[A] motion to strike may be filed only if it is authorized by statute or rule... or if it seeks to strike any part of a filing or submission on the ground that it is prohibited (or not authorized) by a statute, rule, or court order." L.R.Civ. 7.2(m)(1). Defendants argue that Dr. Seavey's report should be stricken because it "is hearsay and lacks foundation." (Dkt. 445 at 2.) Plaintiffs argue that Dr. Seavey's report is not hearsay because it is her opinions and statements based upon her review of the documents provided by Plaintiffs. (Dkt. 450 at 3.)

The Court has reviewed Dr. Seavey's expert report. The Court has taken Defendants' objections into consideration. The Court recognizes that Dr. Seavey's report merely provides

---

[9] Plaintiffs merely cite Federal Rule of Civil Procedure 53(a) and three cases that note the Court's authority to and the general purpose of appointing a master, including an 1889 Supreme Court case, Kimberly v. Arms, 129 U.S. 512, 523 (1889). (See Dkt. 439 at 4-5.)

- 16 -

opinions regarding evidence that is already in the record. The Court has not found a reason to strike the report. Therefore, the Court will deny Defendants' motion to strike.

**V.    Conclusion**

The Court has found that Defendants "failure to prevent unnecessary gaps in service and properly monitor the HCBS program improperly discriminated against persons with disabilities by limiting their ability to maintain their social and economic independence and depriving them of a real choice between home and institutional care." (Dkt. 394 at 9.) The Court has also found that Defendants' failures violated the Medicaid Act's free choice provisions, 42 U.S.C. §§ 1396n(c)(2)(C) and (d)(2)(C), the Americans with Disabilities Act, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. §794. (Id. at 10.)

The Court's injunction requires Defendants to comply with the Medicaid Act's free choice provisions, the ADA, and the RA and provide Plaintiffs with the services that Defendants have found Plaintiffs are entitled to receive. In order to ensure that Plaintiffs receive these critical services, Defendants shall establish a single toll-free hotline telephone number that HCBS members can call to report any gap in critical services, modify their contracts, policies, forms, etc. to require HCBS Program Contractors to have back-up caregivers timely available, and comply with all other provisions of the injunction.

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion to Modify Injunction (Dkt. 403) is **granted in part and denied in part**, according to this Order.

**IT IS FURTHER ORDERED** that Defendants' Cross-Motion to Vacate or Modify the Injunction (Dkt. 422) is **denied**.

**IT IS FURTHER ORDERED** that Plaintiffs' Second Motion to Appoint Special Master (Dkt. 438) is **denied without prejudice** to re-urging as appropriate.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike Expert Report (Dkt. 445) is **denied**.

**IT IS FURTHER ORDERED** that Defendants shall establish a hotline, pursuant to the Court's June 28, 2005 Order (Dkt. 248), within **thirty (30) days** of the date of this Order.

A hotline, for the purpose of the injunction, is a single toll-free telephone number that will allow individuals to report any gap in critical services. The hotline shall be staffed by live operators 24 hours a day, 7 days a week.

**IT IS FURTHER ORDERED** that Defendants shall revise all relevant contracts, policies, forms, notifications, etc. to include:

a. A provision expressly requiring Program Contractors to have back-up workers available on call to substitute for those times when an unforeseeable gap in critical service occurs.

b. A provision expressly requiring Program Contractors to inform members, verbally and in writing, that they have the right to have any gaps in critical services filled within two hours and the right to have a back-up worker substitute when an unforeseen gap in critical service occurs.

**IT IS FURTHER ORDERED** that Defendants shall submit a Notice of Compliance within **thirty (30) days** of the date of this Order that shall state the hotline telephone number and attach a copy of the relevant portions the Program Contractor Agreement that the Court has ordered Defendants to modify.

DATED this 5th day of March, 2010.

_____
Earl H. Carroll
United States District Judge